UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦

**Combustion Products Management, Inc.,**

                **Plaintiff,**

        **-v-**                          **5:05-CV-00929**

**AES Corporation and AES-Puerto Rico, L.P.,**

                **Defendants.**

♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦

APPEARANCES:
Office of Neil Wallace
Neil Wallace, Esq., of Counsel
P.O. Box 339
105 Cherry Street
Ithaca, New York 14851
Attorney for Plaintiff

Hiscock & Barclay, LLP
John D. Cook, Esq., of Counsel
Robert A. Barrer, Esq., of Counsel
One Park Place,
300 South State Street
P.O. Box 4878
Syracuse, New York 13221-4878
Attorneys for Defendants

**Hon. Norman A. Mordue, Chief Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

      Presently before the Court are two motions in this breach of contract action. Defendants AES Corporation ("AES") and AES-Puerto Rico L.P ("AES-PR ") move (Dkt. No. 15) to dismiss the amended complaint. Plaintiff Combustion Products Management, Inc. ("CPM") cross-moves (Dkt. No. 17) for leave to file a second amended complaint.

## BACKGROUND

By Memorandum-Decision and Order dated March 3, 2006 (Dkt. No. 13), this Court granted defendants' motion to dismiss the initial complaint on the ground that it failed to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), and gave leave to replead.  CPM filed an amended complaint on March 19, 2006 (Dkt. No. 14).

Defendants move to dismiss the amended complaint.  In its cross motion for leave to file a second amended complaint, CPM does not oppose dismissal of the following causes of action in the amended complaint: first cause of action (for relief against AES), fourth cause of action (for an injunction against AES-PR), and fifth cause of action (for declaratory relief against AES-PR).  This results in the abandonment of all claims against AES and some against AES-PR.  In the second amended complaint, CPM repleads two causes of action and adds two more.

To avoid confusion, the Court deems the amended complaint to have been abandoned and replaced by the second amended complaint, thus effectively granting the cross motion.  The Court treats defendants' dismissal motion as a motion directed to the second amended complaint.  The parties have had ample opportunity to brief all issues.

## SECOND AMENDED COMPLAINT

The following paragraphs set forth the allegations in the second amended complaint.  They do not constitute factual findings by the Court.

CPM manages coal combustion by-products generated by coal-fired power plants.  AES is an independent power producer located in Virginia.  AES-PR, a subsidiary of AES located in Puerto Rico, operates a coal-fired power plant in Guayama, Puerto Rico.

Paragraphs 6-24 of the second amended complaint describe a transaction occurring in

winter 1998-1999, when CPM performed work for AES at the request of David Sundstrum, an AES employee. CPM performed with the expectation that CPM and AES would enter into a contract. Before a contract was finalized, however, Sundstrum was reassigned to another plant, and his replacement refused to sign a contract with CPM or to reimburse it for its costs.

CPM had no further contact with AES or AES-PR until May 2004, when David Stone (apparently a representative of AES-PR) contacted CPM's president, Neil Wallace, and requested that CPM help him develop off-shore ash utilization options. Stone said that AES-PR was "desperate." When Wallace told him about CPM's previous experience with AES, Stone "pledged that AES-PR would treat CPM fairly."

The second amended complaint states as follows:

> 32. Mr. Wallace then asked Mr. Stone how he wanted to proceed. Mr. Stone asked CPM to develop options at its own expense and present them to AES-PR. If the options were environmentally permittable and less than $12.50 per ton, Mr. Stone stated that AES-PR would provide CPM a maximum of 100,000 tons per year for five years. The parties agreed that the $12.50 would be the cost after loaded [*sic*] in a barge.
>
> 33. Mr. Stone then said that given the time pressures, the promise to provide 100,000 tons per year for options that met the criteria would expire six months after AES-PR was notified of each option.

Thereafter, Wallace met with Stone and Al Dyer, President of AES-PR. The second amended complaint further alleges:

> 35. Mr. Dyer stressed that he was not involved in the prior dealing and if CPM could find options for them, he would pay CPM the $35,000 it spent in reliance on David Sundstrum's representations. Mr. Dyer also said that time was of the essence and he begged CPM to do whatever it could to help AES-PR. He iterated Mr. Stone's promise that if CPM could develop options in less than one year that met the criteria, AES-PR would provide CPM with a maximum of 100,000 tons per year for a minimum of five years.
>
> 36. Both Mr. Dyer and Mr. Stone stated that they understood CPM would be developing these options at its own expense in reliance on their representations regarding the

-3-

provision of ash to CPM. Both again begged CPM to help them as quickly as possible. Mr. Wallace agreed, but explained to Mr. Dyer and Mr. Stone that CPM could not guarantee anything and that it might only develop one option that would last for three months. Mr. Dyer replied that anything would help.

On June 17, 2004, Dyer (on behalf of AES-PR) and Wallace (on behalf of CPM) signed a written contract entitled "Confidentiality Agreement," which provides in part:

> WHEREAS, CPM agrees as follows...:
> - CPM agrees to make available to AES-PR certain Confidential Information, and
> - CPM at its own expense, shall evaluate and qualify potential sites and marketing opportunities in the Caribbean, outside of Puerto Rico, which are environmentally and economically viable to accept ashrock, and
> - CPM shall provide these particular sites and opportunities and all relevant information to AES-PR, and
> - In the event AES-PR and CPM are unable to reach a reasonable agreement after good faith negotiations within six (6) months of the date the particular option is presented, AES-PR retains the right to pursue direct agreements with any of the parties presented by CPM, and
> - Nothing herein will limit each Party's right to pursue any project, opportunity, request for proposal, joint venture, strategy or other business arrangement, and neither party will assert that the other is prohibited from pursuing any project, opportunity, request for proposal, joint venture, strategy or other business arrangement as a result of having information received pursuant to this agreement.
>
> WHEREAS, AES-PR agrees as follows...:
> 1. Confidentiality Undertaking
>    We undertake (a) to keep the Confidential Information confidential and not to disclose it to anyone except as provided for by paragraph 2 below and to ensure that the Confidential Information is protected with security measures and a degree of care that would apply to our own confidential information, (b) to use the Confidential Information only for the Permitted Purpose, and (c) to use all reasonable endeavors to ensure that any person to whom we pass any Confidential Information ... acknowledges and complies with the provisions of this Agreement as if that person were also a party to it.
>
> "Permitted Purpose" means considering and evaluating the project.
>
> 2. Permitted Disclosure

> You agree that we may disclose Confidential Information:
>> a) with your prior written consent;
>> b) to our employees, professional advisors and authorised representatives to the extent that disclosure is necessary for the Permitted Purpose;
>> c) to any person whom we may (i) form a consortium with, or (ii) contract with, in each case in relation to and to the extent necessary for the Permitted Purpose; and
>> d) where requested or required by any court of competent jurisdiction, applicable law or regulation, or AES-PR's lenders[.]
>
> ***
>
> 3. Notification of Required or Unauthorised Disclosure
>
> We agree (to the extent permitted by law) to inform you of the full circumstances of any disclosure under paragraphs 2(c) or (d) or upon becoming aware that Confidential Information has been disclosed in breach of this Agreement.
>
> 4. Continuing Obligations
>
> The obligations in this Agreement are continuing and, in particular, shall survive the termination of any discussions or negotiations between you and us. Notwithstanding the previous sentence, the obligations in this Agreement shall cease (a) if we become a party to an agreement in respect of the Project or (b) six (6) months after the date hereof.
> ***

According to the second amended complaint, "[b]ased solely on the promise of Mr. Dyer and Mr. Stone, CPM began an extensive effort to develop utilization options for the ash[.]" In September 2004 CPM notifed AES-PR that "it was developing an option on St. Croix"; that it would take several months to test the ash and obtain approvals; that CPM was confident it could ultimately obtain approvals; that the total cost would be less than $12.50 per ton; and that it was working on several other options. In November 2004 CPM notified AES-PR that it had "another potential option" in St. Lucia.

In December 2004, AES-PR "informed CPM to cease all activity on their behalf and that they were terminating the relationship." CPM responded that it "had spent enormous sums of money in reliance on their promise and had two options that would soon be permitted and meet

-5-

their criteria." In response AES-PR again demanded that CPM stop all activity on its behalf. In January 2005 CPM informed Stone that it had "received permission" for the St. Croix and St. Lucia options. AES-PR did not respond regarding either option, but stated its position that it had no obligation to CPM.

**First cause of action**

The first cause of action is based on Dyer's alleged oral promise that if CPM could "find" options for AES-PR, Dyer would pay CPM the $35,000 it had spent in 1998-1999 in reliance on Sundstrum's representations. CPM states that this promise was an offer which CPM accepted when it provided "viable" options to AES-PR. CPM claims that it performed as required and that AES-PR breached its promise to pay. CPM seeks to recover $35,000.

**Second cause of action**

CPM states that it "relied on the specific [oral] promise of David Stone and Al Dyer in developing options for the coal ash to provide 100,000 tons per year to CPM if it could provide options that were permittable and less than $12.50 per ton"; that "despite being provided two such options, AES-PR refused to honor its promise"; and that AES-PR knew "that CPM would spend time and money based solely on AES-PR's representation and promise." CPM claims that "based on promissory estoppel or detrimental reliance," CPM is entitled to recover damages in the amount of $120,000.

**Third cause of action**

In the third cause of action, CPM alleges "a breach of contract by AES-PR, and seeks equitable relief." Specifically, CPM relies on the June 17, 2004 written Confidentiality Agreement. In this respect, the second amended complaint avers:

-6-

   59. One obligation imposed on CPM [under the Confidentiality Agreement] was to "evaluate and qualify potential sites and marketing opportunities in the Caribbean."
   60. The agreement required CPM to notice AES-PR of those opportunities and to provide all relevant information.
   61. In consideration of CPM's obligations, the agreement specifically obligated both AES-PR and CPM to negotiate in good faith an agreement to utilize said options, and if the parties were not able to do so within six months of the date AES-PR was first notified by CPM, then AES was free to pursue the option directly.
   62. The contract states "In the event AES-PR and CPM are unable to reach a reasonable agreement after good faith negotiations within six months of the date the particular option is presented....." [1]
   63. It is clear that the intent of the parties pursuant to the agreement was to negotiate in good faith each option presented to AES-PR by CPM, otherwise this clause, drafted by AES-PR, would have no meaning.
   64. AES-PR refused to negotiate with CPM on any of the options presented, in breach of this agreement.

CPM seeks injunctive relief compelling specific performance "requiring AES-PR to honor its obligation under the agreement and negotiate options presented in good faith."

**Fourth cause of action**

In the fourth cause of action plaintiff alleges that, in addition to the Confidentiality Agreement, the parties "entered into [an oral] contract whereby AES-PR agreed to provide CPM with 100,000 tons of material per year if CPM developed utilization options that were environmentally permittable and less than $12.50 per ton in cost"; that "less than six months after entering into this agreement, CPM notified AES-PR of two such options that it was developing"; that "less than eight months after entering into the agreement, CPM received approval and was prepared to immediately begin taking material from AES-PR and so

---

[1] The full contractual provision excerpted in paragraph 62 of the second amended complaint reads:
  In the event AES-PR and CPM are unable to reach a reasonable agreement after good faith negotiations within six (6) months of the date the particular option is presented, AES-PR retains the right to pursue direct agreements with any of any of the parties presented by CPM[.]

-7-

notified AES-PR"; and that "AES-PR refused to provide CPM with material[,]" thus breaching the contract and damaging CPM in the amount of $2 million.

## PRIOR PLEADINGS

Because prior inconsistent pleadings are generally admissible against the pleader, and factual allegations therein are treated as controvertible admissions,[2] the Court reviews the first amended complaint and the initial complaint. The factual allegations in the first amended complaint do not differ significantly from the second amended complaint. The initial complaint, however, differs markedly, and the Court summarizes it below.

The initial complaint alleges that the parties entered into an oral agreement whereby "CPM at its own expense would develop potential options and present them to AES-PR. If the potential option looked viable, there would then be a maximum six month period to finalize the option and AES-PR then could accept or reject it." The complaint further stated: "The intent of the parties was to give CPM six months from the time it proposed the option to get all necessary freight, use and permits confirmed. The parties understood it takes time to put all the pieces in place." CPM claims that, in December 2004 and January 2005, AES-PR wrongfully instructed

---

[2] On the question of the admissibility of superseded pleadings in civil litigation, the Second Circuit explained:

> The law is quite clear that such pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party. A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories.

*United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) (citations omitted); *accord In re Parmalat Securities Litigation*, 421 F.Supp.2d 703, 713 (S.D.N.Y. 2006).

CPM to cease all activities.

The oral contract alleged by CPM in the initial complaint appears to impose no obligation on AES-PR, except possibly to inform CPM whether it accepted or rejected a "finalized" option. CPM appears to claim, however, based on various theories, that when CPM presented "potential options," AES-PR was obligated in good faith to consider them.

## APPLICABLE LAW

In addressing defendants' motion to dismiss the second amended complaint under Fed. R. Civ. P. 12(b)(6), the Court accepts as true the factual allegations of the complaint and draws all inferences in favor of the plaintiff. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). Dismissal under Rule 12(b)(6) is proper only if it appears beyond doubt that plaintiff can prove no set of facts which would entitle it to relief. *See Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994).

It is black-letter law that "[i]n order to plead a breach of contract cause of action, a complaint must allege the provisions of the contract upon which the claim is based[.]" *Atkinson v. Mobil Oil Corp.*, 614 N.Y.S.2d 36, 37 (2d Dep't. 1994). "A breach of contract claim will be dismissed as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory fashion, the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated." *Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 WL 35439, *8 (S.D.N.Y. 2004) (internal quotes and citation omitted). The plaintiff "should determine in his own mind the legal effect of the written contract or other document upon which his cause of action is founded, and plead its legal effect as he understands it, and as he purposes to maintain it[.]" *United States Printing & Lithograph Co. v. Powers*, 170 N.Y.S. 314 (1st Dep't

1918).

In reviewing the terms of a contract to determine whether the plaintiff can prove any set of facts which would entitle it to relief, a court is "not constrained to accept the allegations of the complaint in respect of the construction of the Agreement." *International Audiotext Network, Inc. v. American Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). On a dismissal motion, all contractual ambiguities must be resolved in the plaintiff's favor. *See id.*

As previously noted, prior inconsistent pleadings are generally admissible against the pleader. *See In re Parmalat Securities Litigation*, 421 F.Supp.2d 703, 713 (S.D.N.Y. 2006). Factual allegations therein are treated as controvertible admissions. *See id*.

## DISCUSSION

**Generally**

Despite three attempts, CPM has failed to state coherently the terms of the alleged contract upon which it relies.[3] Rather, the pleadings allege various contradictory agreements governing the same transaction.

First, in paragraphs 32-37 of the second amended complaint, CPM alleges an oral agreement whereby CPM's presentation of "permittable" options meeting AES-PR's criteria would directly give rise to a binding obligation on the part of AES-PR to provide ash. For

---

[3] Indeed, the two amended pleadings do not clarify the contractual terms but rather appear to recast them in response to the objections raised by defendants. For example, the Statute of Frauds, New York General Obligations Law § 5-701(a)(1), likely bars enforcement of the alleged oral agreement to provide ash for five years. After defendants raised the statute of frauds issue in their motion to dismiss the amended complaint, CPM alleged for the first time in the second amended complaint that Wallace told Dyer that CPM might only be able to develop one option that would last for three months. CPM then relied on this allegation in opposing dismissal on statute of frauds grounds.

example, according to paragraph 32 of the second amended complaint, Stone orally agreed that, if CPM presented an option that was "environmentally permittable and less than $12.50 per ton," AES-PR was obligated to "provide CPM a maximum of 100,000 tons [of ash] per year for five years." According to paragraph 35, Dyer orally "iterated" Stone's alleged promise. It is not clear whether CPM alleges it presented "permittable" options in September and November 2004 when it presented "potential" options in St. Croix and St. Lucia, or in January 2005 when it received "permission" to utilize ash in those locations.[4] In any event, AES-PR allegedly breached the agreement by refusing to provide ash (see, *e.g.*, the fourth cause of action of the second amended complaint).

Second, in paragraph 33, the second amended complaint appears to allege a different agreement. Paragraph 33 avers that Stone stated that, "given the time pressures, the promise to provide 100,000 tons per year for options that met the criteria would expire six months after AES-PR was notified of each option." The meaning of this allegation is unclear. It appears to mean that Stone agreed that, after informing AES-PR of a potential option, CPM had six months to finalize it, and, if CPM succeeded in doing so, then AES-PR would be bound to provide ash. In this version, it seems that the breach would have occurred when AES-PR terminated the agreement without giving CPM six months to finalize.

Third, the initial complaint alleges an agreement that is inconsistent with both agreements described above. The initial complaint relies on an oral agreement whereby "CPM at its own

---

[4] The ordinary meaning of a "permittable" option would be an option that was capable of receiving a permit, not one that had already received one. The suffix "-able" is defined as "capable of, fit for, or worthy of (being so acted upon or toward)." *See Merriam-Webster's Collegiate Dictionary* (10th ed.).

-11-

expense would develop potential options and present them to AES-PR. If the potential option looked viable, there would then be a maximum six-month period to finalize the option and AES-PR then could accept or reject it." In this version of the contract, AES-PR was free to accept or reject the option when it was finalized or upon the expiration of the six-month period, whichever occurred first. Presumably such an agreement would have been breached when AES-PR sent the termination letter in December 2004, prior to CPM's finalization of the two options in January 2004 (at which point AES-PR was free to reject the options).

Finally, the second amended complaint, in paragraphs 57-64, alleges that AES-PR breached the written Confidentiality Agreement.[5] CPM seems to argue that the Confidentiality Agreement prohibited AES-PR from rejecting any potential option without first negotiating for six months, and that AES-PR breached by refusing to negotiate. CPM also seems to interpret the Confidentiality Agreement as prohibiting AES-PR from pursuing an option directly without first negotiating for six months; however, since CPM does not claim that AES-PR ever did pursue an option directly, it does not allege a breach in this respect.

It is obvious from the above discussion that the second amended complaint fails to state clearly the terms of the parties' agreement. In reviewing these differing alleged agreements, the Court observes that the second amended complaint does not clearly state what type of option – "potential," "permittable," "viable," "developed," or "finalized" – would trigger AES-PR's obligations; indeed, it is not clear what these terms mean in the context of this transaction. As noted above, it is also unclear whether CPM claims that, upon being notified of some type of

---

[5] The Court emphasizes that the discussion herein of the Confidentiality Agreement is not intended to reflect the Court's construction of that document, but rather concerns CPM's allegations based on the Confidentiality Agreement.

option, AES-PR was obligated to provide ash, to give CPM six months to finalize the option, or to negotiate for six months.

Also, the duration of the agreement is not clearly stated. For example, Dyer allegedly referred to a one-year period to "develop options"; Stone allegedly stated that the promise to provide ash would expire six months after AES-PR was "notified" of each option; and the Confidentiality Agreement provided that the obligations thereunder would expire in six months, that is, on December 17, 2004.

There are other difficulties regarding the agreements alleged by CPM. For example, CPM claims that AES-PR agreed to provide a "maximum" of 100,000 tons. No minimum amount is alleged; thus, presumably, AES-PR could provide no ash whatsoever without breaching the agreement. Also, CPM alleges in paragraph 37 that in June 2004, Wallace told Dyer and Stone that CPM might only develop one option that would last for three months, and Dyer replied that "anything would help." Does this mean that, even if CPM developed only one option lasting only three months, AES-PR would be bound to provide ash for five years? If it developed only one option lasting only one week?

In sum, a review of the initial complaint and the two amended pleadings in this case establishes that CPM fails to specify the terms of the parties' agreement, the parties' obligations thereunder, the exact manner in which CPM performed, and the exact manner in which AES-PR failed to perform. The Court now turns to consider each of the four causes of action alleged in the second amended complaint.

**First cause of action**

The first cause of action is based on Dyer's alleged oral promise that if CPM could "find"

options for AES-PR, Dyer would pay CPM the $35,000 it had spent in 1998-1999 in reliance on Sundstrum's representations. CPM states that this promise was an offer which CPM accepted when it provided "viable" options to AES-PR. On these pleadings, the only reasonable interpretation of Dyer's offer to pay $35,000 is that it depends on the same performance by CPM as would give rise to AES-PR's obligation to provide ash. And, as discussed above, the nature of that performance is not clearly pleaded.

**Second cause of action**

CPM states that it "relied on the specific promise of David Stone and Al Dyer in developing options for the coal ash to provide 100,000 tons per year to CPM if it could provide options that were permittable and less than $12.50 per ton"; that "despite being provided two such options, AES-PR refused to honor its promise"; and that AES-PR knew "that CPM would spend time and money based solely on AES-PR's representation and promise." CPM claims that "based on promissory estoppel or detrimental reliance," CPM is entitled to recover damages in the amount of $120,000.

This cause of action suffers from the defects discussed above, particularly the failure clearly to allege the terms of the parties' agreement. Merely alleging a "promise" instead of a contract does not cure this defect.

**Third cause of action**

In the third cause of action, CPM alleges a breach by AES-PR of the written Confidentiality Agreement. CPM seeks an injunction compelling specific performance "requiring AES-PR to honor its obligation under the agreement and negotiate options presented in good faith." As discussed above, this alleged agreement contradicts other contractual terms alleged in

the second amended complaint.  And if, under the terms of the Confidentiality Agreement, AES-PR's refusal to negotiate merely precluded AES-PR from pursuing any option directly, then the second amended complaint does not plead any breach of that agreement.

**Fourth cause of action**

The fourth cause of action is for breach of the alleged oral contract whereby AES-PR agreed to provide CPM with 100,000 tons of material per year for a minimum of five years "if CPM developed utilization options that were environmentally permittable and less than $12.50 per ton in cost."  As discussed above, this is one of the various versions of the same contract alleged in the second amended complaint; therefore, the second amended complaint fails to allege the terms of the contract upon which it relies.  Moreover, this claim is almost certainly barred by the Statute of Frauds, New York General Obligations Law § 5-701(a)(1).

**Leave to amend**

These problems constitute fatal defects in pleading the essential terms of the alleged contract.  It is fundamental that the complaint in a breach of contract action must allege the provisions of the contract upon which the claim is based.  *See Atkinson*, 614 N.Y.S.2d at 37.  CPM cannot be permitted to proceed on a complaint which pleads various contradictory versions of the same alleged agreement.

It cannot, however, conclusively be stated that it appears beyond doubt that CPM can prove no set of facts which would entitle it to relief.  Thus, the Court will afford CPM one more opportunity to prepare, if it can, a pleading that specifically states the terms of the parties' agreement, the parties' obligations thereunder, the exact manner in which CPM performed, and the exact manner in which AES-PR failed to perform.

When granting leave to amend, courts have discretion to impose reasonable conditions, including the imposition of attorney's fees, in order to address prejudice that the opposing party will suffer as a result of the amendment. *See, e.g., Hayden v. Feldman*, 159 F.R.D. 452, 454-55 (S.D.N.Y. 1995) (awarding fees to defendant who "would not have been put to the expense of moving to dismiss the faulty Third Amended Complaint had plaintiffs filed a proper complaint at the outset"). Here, defendants have been forced to move twice to dismiss defective pleadings, and further have been compelled to respond to plaintiff's cross motion for leave to file yet another defective pleading. Thus, the Court in its discretion finds that leave to CPM to file a third amended complaint must be conditioned upon CPM's payment to AES-PR of its reasonable attorney's fees and costs incurred in moving to dismiss the amended complaint and in responding to plaintiff's cross motion for leave to file the second amended complaint.

## CONCLUSION

It is therefore

ORDERED that plaintiff's motion (Dkt. No. 17) for leave to file a second amended complaint is granted; and it is further

ORDERED that defendants' motion (Dkt. No. 15) to dismiss the amended complaint (deemed to be a motion to dismiss the second amended complaint) is granted, and the second amended complaint is dismissed with leave to replead on or before July 18, 2006; and it is further

ORDERED that if a third amended complaint is not filed on or before July 18, 2006, the action will be automatically dismissed with prejudice without further order of the Court; and it is further

ORDERED that if a third amended complaint is filed on or before July 18, 2006, defendants' counsel may submit a detailed application for attorney's fees and costs associated

with (1) defendants' motion to dismiss the amended complaint and (2) defendants' opposition to plaintiff's cross motion to file a second amended complaint; within 15 days thereafter, plaintiff may submit a response to any matters in that application; and thereafter, the Court will issue an attorneys-fee order directing plaintiff to pay to defendants' counsel a specified sum within a specified period of time; and it is further

ORDERED that plaintiff's failure to comply with the attorneys-fee order will result in dismissal of the third amended complaint with prejudice and may result in further sanctions.

IT IS SO ORDERED.

June 27, 2006
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-17-